Abdus-Salaam, J.
(dissenting). Because I believe that the courts below abused their discretion in holding that infant plaintiff Wally G.’s hospital records did not provide defendant New York City Health and Hospitals Corporation (HHC) with actual knowledge of injury attributable to its potential malpractice, I dissent.
Wally — who suffers from a range of neurological and cognitive deficits and disorders, including cerebral palsy, seizures, and speech defects — served, through his mother, a late notice of claim on HHC, without leave of court, alleging that HHC failed to timely and properly treat fetal distress and deliver him. At issue in this case is whether the courts below abused their discretion in denying Wally’s motion for an order deeming the previously-filed notice of claim timely nunc pro tunc or, in the alternative, granting him permission to file a late notice of claim. Wally asserts that his motion should have been granted because HHC’s medical records supplied it with actual knowledge of the essential facts constituting his present claim and therefore HHC would not be prejudiced by permitting the late filing. The majority concludes that the courts below did not abuse their discretion in denying Wally’s motion because his medical records did not provide HHC with actual knowledge of the facts underlying his claim. That conclusion, however, is belied by the record in this case.
General Municipal Law § 50-e requires that a notice of claim be served on a municipal defendant in a tort action within 90 days of accrual. Where a plaintiff fails to comply with the time limit under the statute, courts may in their discretion extend the time to serve the notice of claim (see General Municipal Law § 50-e [5]). In determining an application to serve a late notice of claim, the court must weigh “all . . . relevant facts and circumstances,” including, as relevant here, “whether the [defendant] . . . acquired actual knowledge of the essential facts constituting the claim within the time specified [in General Municipal Law § 50-e (1) (a)] or within a reasonable time thereafter” (id.). Additionally, the court may also consider the plaintiff’s infancy and whether service of a late notice of claim would “substantially prejudice” the defendant (id.; see generally Williams v Nassau County Med. Ctr., 6 NY3d 531, 535 [2006]). Courts of this state have recognized that General Municipal Law § 50-e “is not intended to operate as a device to *679 frustrate the rights of individuals with legitimate claims” (Matter of Porcaro v City of New York, 20 AD3d 357, 357-359 [1st Dept 2005]) and because of its remedial nature, it should be liberally construed (see id.) Matter of Ruperti v Lake Luzerne Cent. School Dist., 208 AD2d 1146, 1147 [3d Dept 1994]; Robb v New York City Hous. Auth., 71 AD2d 1000, 1001 [2d Dept 1979]; Matter of Kaiser v Town of Salina, 20 AD2d 312, 314 [4th Dept 1964]; see also Adkins v City of New York, 43 NY2d 346, 350 [1977]).
In Williams v Nassau County Med. Ctr. (6 NY3d 531 [2006]), we addressed our standard for determining when the filing of a late notice of claim based on actual knowledge of the essential facts should be permitted. We held that
“[m]erely having or creating hospital records, without more, does not establish actual knowledge of a potential injury where the records do not evince that the medical staff, by its acts or omissions, inflicted any injury on plaintiff during the birth process.
“The relevant inquiry is whether the hospital had actual knowledge of the facts — as opposed to the legal theory — underlying the claim” (id. at 537).
In Williams, the mother had a difficult delivery. Nassau County Medical Center employees gave the mother Pitocin, a drug used to facilitate birth. Thereafter the medical staff attempted twice to deliver the child through vacuum extraction, but ultimately had to use forceps which resulted in breaking the child’s clavicle. The hospital records indicated that the mother’s pelvis was adequate in size to accommodate the child’s head, and otherwise noted that the delivery was without complication. The child complained that his epilepsy and developmental disabilities were the result of the hospital’s negligence during his birth. We affirmed the denial of a motion to file a late notice of claim because, although the hospital records evinced a difficult delivery, “there was scant reason to identify or predict any lasting harm to the child” (id.). We stated that “[w]here, as here, there is little to suggest injury attributable to malpractice during delivery, comprehending or recording the facts surrounding the delivery cannot equate to knowledge of facts underlying a claim” (id.).
As stated by the majority, our holding in Williams requires that the hospital records evince actual knowledge that the *680 medical staff, by its acts or omissions, inflicted injury on the plaintiff. However, contrary to the majority’s conclusion, under that standard, the medical records submitted by Wally in support of his motion to file a late notice of claim demonstrate that HHC had actual knowledge of the facts underlying Wally’s claim.
Wally’s medical records demonstrate that mother’s delivery was particularly complicated, leaving Wally with a number of defects, and as a result, the hospital could predict lasting harm to Wally. In particular, the records show that Wally was born premature, in the seventh month of gestation. Prior to his birth, Wally’s mother — a diabetic with a history of a prior miscarriage and a prior premature birth at 29 weeks — presented at HHC’s Metropolitan Hospital on numerous occasions complaining of vaginal bleeding and blood clots. Following multiple discharges, mother was ultimately diagnosed with possible chronic placental abruption but, nonetheless, she was again discharged from the hospital and instructed to follow up with the clinic. Thereafter, mother returned to Metropolitan, stating that she continued to experience vaginal bleeding and also passed blood clots. Her condition worsened while in the hospital, demonstrating “symptom[s] of chorioamnionitis.”[1] An attending doctor’s note states that at one point the fetal heart rate was in the tachycardiac range, indicating an abnormal increase in the heart rate. The hospital staff determined that mother should deliver by cesarean section, and indicated in the preoperative notes that mother in fact had a placental abruption with active bleeding.
Immediately following his birth, Wally was transferred to the neonatal intensive care unit. According to the obstetrical chart, Wally’s Apgar score[2] was five at one minute after birth and seven at five minutes. Wally was unable to breathe on his own after birth, but was not immediately intubated. He was eventually placed on a mechanical ventilator; however, he was already experiencing hypoxia, or lack of oxygen. Wally’s hospital records also indicate that he suffered a grade III in-traventricular hemorrhage (IVH). Based on this injury, an attending spoke with Wally’s parents about the possibility of brain damage and referred Wally to the developmental clinic *681 and early intervention programs. Wally’s medical records also indicate that five months following his discharge from the hospital, his mother brought him back complaining of seizure activities.
As recounted by the three expert affirmations Wally submitted in support of his motion, the hospital records show that HHC departed from good and accepted medical practice which proximately caused Wally’s neurological deficits. In particular, the experts opined that mother was not prescribed the proper course of antibiotics during her earlier visits to the hospital, that Wally should have been delivered by cesarean section sooner, and that he should have been immediately intubated following birth, the failure of which likely caused his IVH. Under these circumstances, it is difficult to understand how HHC could deny having actual knowledge of the facts underlying Wally’s claims.
The majority’s conclusory assertion that the records, expert testimony, and other facts “do not address whether HHC had actual knowledge of the essential facts necessary to properly defend itself in the underlying action” (majority op at 677) turns a blind eye to the wealth of record evidence demonstrating HHC’s actual knowledge. All of the facts relied upon by Wally to support his claims of medical malpractice are in HHC’s medical records, which satisfies the relevant inquiry we established in Williams — namely, “whether the hospital had actual knowledge of the facts — as opposed to the legal theory— underlying the claim” (6 NY3d at 537). To review, Wally’s medical records establish that mother experienced a difficult pregnancy and was at risk of premature delivery. Mother was repeatedly discharged from the hospital despite the recurrence of vaginal bleeding. Although a placental abruption had been ruled out, it was ultimately determined that mother did in fact have a placental abruption which contributed to the vaginal bleeding she experienced. The records show that mother had chorioamnionitis and Wally experienced fetal tachycardia and hypoxia, which his experts affirm was a result of the hospital’s negligence in failing to timely deliver him by cesarean section and the failure to immediately intubate him following his birth. One of Wally’s experts claims that this failure likely caused his severe IVH.
Most compelling is the discussion between the hospital’s medical staff and Wally’s parents concerning the risk of brain damage after Wally suffered the IVH. This clearly indicates *682 that the hospital was aware that the conditions under which Wally was born could have lasting effects. Furthermore, Wally returned to the hospital with seizure activity a mere five months after being discharged. This visit certainly put HHC on notice that Wally was potentially injured. Although Wally may have been discharged from the hospital “in stable condition” (majority op at 675), as is normally the case, there is clear evidence in his medical records that Wally would suffer lasting harm due to injuries resulting from his birth. Thus, it is not surprising that Supreme Court noted that if a motion were made on summary judgment grounds, the motion would be denied, and it is equally unsurprising that two Justices of the Appellate Division dissented.
HHC’s experts dispute Wally’s claims, contending that IVH, as well as his other injuries, are common corollaries to premature delivery. However, those issues, which are relevant to the merits of the underlying malpractice claim, must be distinguished from the conceptually separate legal question of whether the medical records put HHC on actual notice that its staff may have harmed Wally.
Because Wally’s medical records provided HHC with actual knowledge, Wally’s delay in filing a late notice of claim did not prejudice HHC. That notice, although late and improperly served without leave of court, clearly put HHC on notice of Wally’s legal claims, allowing it to commence its investigation. Our primary concern at this juncture is whether HHC’s records provided it with actual knowledge of the facts underlying the claim, not the viability of that claim. Because General Municipal Law § 50-e is to be liberally construed and not present a barrier to a legitimate claim, I conclude that the courts below abused their discretion by denying Wally’s motion to file a late notice of claim.
Chief Judge DiFiore and Judges Stein and Garcia concur; Judge Abdus-Salaam dissents in an opinion in which Judges Rivera and Fahey concur.
Order affirmed, with costs.

. Chorioamnionitis is an infection of the placental membrane which compromises the ability of the placenta to supply oxygen to the fetus.

. An Apgar score is used to evaluate the condition of a newborn infant. The range is from zero to 10, with 10 being a perfect score.